## Nirdlinger's Estate.

*Decedents' estates—Life-tenant and remainderman—Profit on sale of capital assets.*

1. The profit on a sale of capital assets is not income as between life-tenant and remainderman.

*Decedents' estates—Corporations—Life-tenant and remainderman—Profits earned but not declared, as dividends.*

2. The doctrine of extraordinary dividends, which originated in Earp's Appeal, 28 Pa. 368, in determining the relative rights thereto of life-tenant and remainderman of a decedent's estate is confined to dividends actually declared or to accumulated profits of corporations which have been virtually liquidated. Where a corporation is in active operation, the auditing judge may not, with a view to ascertain the relative rights of life-tenant and remainderman in a decedent's estate, inquire into the existence of profits alleged to have been earned where no dividends have been declared. Whether or not dividends can be declared by an active corporation depends upon the amount of depreciation, obligations due and risks incurred, which are matters for the proper exercise of the discretion of the board of directors.

Exceptions to adjudication. O. C. Phila. Co., July T., 1919, No. 737.

The facts appear from the following extract from the opinion of GEST, J., Auditing Judge:

"Included in the principal of the estate were certain stocks of five theatre companies, viz., South Broad Street Theatre Company, New Garrick Theatre Company, Ford Theatre Company, New Nixon Theatre Company and the New Nixon Apollo Theatre Company, and the trustees sold the same for $170,000. The petition of the trustees for leave to consummate the sale was referred by the court Dec. 12, 1925, to James F. Hagen, Esq., as master, upon whose report, filed Feb. 9, 1926, the court entered a decree approving the sale.

"The details of the transaction appear in the master's report and in the statement of Mr. Arnold, one of the trustees, who was active in the negotiations. The question was raised by Mr. Birmingham, representing Theresa B. Nirdlinger and J. Frederick Zimmerman Nirdlinger, entitled to certain percentages of the income as above stated, that some $40,000 of the moneys so received represented undistributed earnings of the companies whose stock was so sold. According to Mr. Birmingham's argument, as I understand it, the capital originally invested was but $21,370 and, for a number of years, practically no income was derived from the enterprise, and in the end it appeared that $40,000 of the $170,000 so received by the trustees might and should have been distributed as income by the stock companies, and would have been so distributed had the stock been retained by the trustees. It is, therefore, argued that, equitably, at least $40,000 of the $170,000 should be now distributed as income. I cannot agree with this view of the law. The trustees owned stock of the said companies which, in the aggregate, have accumulated income or surplus; but until and unless dividends were declared, this surplus remained as a principal asset of the companies, and the proceeds of sale of the stock must be considered as principal. Profits earned by a corporation do not belong to the stockholders, as income, until they have been distributed by corporate action. The consequences of a different theory would be most far-reaching, for whenever a trustee sells stock at a profit, it would be necessary to determine how much of the price realized depended upon the existence of a surplus of undivided profits. The claim is dismissed.

"Mr. Hartmann, in like manner, claimed that, as the original investment is some $21,370 and $170,000 were realized, the entire difference or profit of

Nirdlinger's Estate.

$148,630 should be transferred to income account. In other words, that, on a sale of principal assets, the profit over the cost price should be considered as income. There is even less merit in this suggestion. The profit on the investment enures to principal. All that is given to the life-tenant is rents, issues, income, interest, dividends and revenues, and, even if the gift had been of profits, the gain on the investment could not, under the law, be considered as income. A very similar question was considered at length in Leech's Estate, 4 D. & C. 1, and much of what is there said is applicable here."

*J. Fred Hartmann* and *W. W. Montgomery, Jr.,* for exceptions.

*Francis Shunk Brown, Jr., Spalding & McCabe* and *Francis Shunk Brown,* for exceptants.

*Arthur S. Arnold* and *Hon. James Gay Gordon,* contra exceptions.

VAN DUSEN, J., Dec. 17, 1926.—Decedent's estate had interests in theatrical enterprises in which he had embarked. His trustees, with leave of this court, entered into an agreement with other men in that line, as a result of which they became owners of part of the stock of five companies which operated various theatres, and the companies entered into an agreement for pooling their receipts. In these companies the trustees invested a comparatively small amount of money as stock and loans. Later, with the leave of this court after inquiry by a master, the interests of the estate were sold by trustees to the other members of the pool for a sum many times larger than the capital invested.

A claim is now presented by the life-tenants for that part of the sum so realized which is claimed to represent profits of operation earned by the companies, but not distributed. A further claim is also presented that the whole difference between the purchase price and the money invested is income.

The last claim is most easily disposed of, because the facts are simple and the law ought to be clear. Profit on sale of capital assets is not income as between life-tenant and remaindermen: Leech's Estate, 4 D. & C. 1. It is said that the profit in that case was not realized during the life tenancy. But this is not the ground of the decision, and the cases there reviewed fully support the general conclusion, notably Graham's Estate, 198 Pa. 216; Kemble's Estate, 201 Pa. 523; Neel's Estate (No. 2), 207 Pa. 446; as does also the case of McKeown's Estate, 263 Pa. 78. There may be difficulty in reconciling Park's Estate, 173 Pa. 190, and Quay's Estate, 253 Pa. 80, with this doctrine on broad lines, but we believe these decisions were so influenced by the gift of "income and *profits*" to the life-tenant that they are not to be regarded as controlling authorities where, as here, the word "profits" is not used.

The life-tenants ask us to disregard the corporate form because of the circumstances, and having turned the five enterprises and their stockholders into a sort of partnership, to regard the profits of the sale as operating profits, citing Thomson's Estate, 153 Pa. 332, and Oliver's Estate, 136 Pa. 43. These, however, were cases where the business of an unincorporated association was buying and selling land. The business here was operating and not trading in capital assets. Moreover, there was no sale of the common property but only the selling out of his interest by one member to the other.

As to the claim for profits earned by the companies, but not declared as dividends, which it is said are reflected in the purchase price, the Auditing Judge held that he could make no inquiry into the fact of those profits, saying that it was solely within the power of the directors of the corporation to make profits available to stockholders in the form of dividends, and that if such an inquiry could be made in this case, it could be made in the case of any sale of

corporate stock. As against this conclusion, another branch of the decision in the McKeown's Estate, 263 Pa. 78, is pressed upon us. The stock of the Pure Oil Company, there in question, was the investment of the testator, and a sale of it "was made, in conjunction with all the other outstanding shares of stock, to the Ohio Cities Gas Company, which thereby obtained all the assets of the Pure Oil Company, including the accumulated and undistributed income, and 'amounted to a virtual liquidation of the Pure Oil Company, which was formally dissolved on Feb. 23, 1918.'" To this state of facts the court applied the doctrine of extraordinary dividends which originated in Earp's Appeal, 28 Pa. 368. It was found that between testator's death and the sale, which was a virtual liquidation, the book value of the stock had increased in a certain amount as the result of accumulated income; and this sum was allocated to income, though there was no action of the directors declaring a dividend. No action of the directors was needed to determine what should be released as a dividend, and what should be retained to meet the exigencies of the business; for all the assets were distributed and the company had no more business. In the present case, one interest sold its share to the others and the company continued to operate. Assuming that the books then showed earned profits, no dividends could be declared by an active company until consideration had been had of such things as depreciation, obligations incurred, and all the risks of this fascinating and precarious business. A special problem facing this company was the dispute over the construction of the pooling agreement, which might have cut ostensible profits in half. Whether the owner of stock takes his money out or leaves it in, as long as such problems exist, only the directors can divide the income from the principal.

The exceptions are dismissed and the adjudication is confirmed absolutely.